AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No.   '24  MJ2539  DDL |
| Apple Inc. iCloud Account (619) 942-0940, | ) |
| manefire@hotmail.com | ) |
| | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 952, 960, and 963 | Importation of federally controlled substances and conspiracy related thereto |

The application is based on these facts:

See Affidavit of Special Agent Sarah Cordes, which is hereby incorporated by reference and made part hereof.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Sarah Cordes, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date:   _____07/02/2024_____

_____
*Judge's signature*

City and state:   San Diego, California

Hon. David D. Leshner, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

I, Special Agent Sarah Cordes, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.     I make this affidavit in support of an application for a search warrant for information associated with the following iCloud account that is stored at premises owned, maintained, controlled, and/or operated by Apple Inc. (Apple), an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way, Cupertino, California:

(619) 942-0940, manefire@hotmail.com, used by Diego BONILLO (the **Target Account**)

as described further in Attachment A for items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, importation of federally controlled substances and conspiracy to do the same, in violation of Title 21, United States Code, Sections 952, 960, and 963, as described in Attachment B. This affidavit is made in support of an application for a search warrant under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Apple to disclose to the United States copies of the information (including the content of communications) described in Section II of Attachment B. Upon receipt of the information, United States-authorized persons will review that information to locate the items described in Section III of Attachment B.

2.     The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers who have personal knowledge of the events and circumstances described herein; my review of documents and reports related to this investigation; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others

have learned during the course of this investigation. Conversations are set forth below in substance unless noted. Dates, times, and amounts are approximate.

## BACKGROUND AND EXPERIENCE

3. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since June 2023. I am currently assigned to the San Diego Field Office where I handle public corruption and border corruption cases as a member of the Border Corruption Task Force (BCTF). I am charged with investigating allegations of corrupt federal, state, and local public officials that engage in criminal activity for profit, power, as well as those criminal associates who bribe and conspire with any corrupt federal, state, or local public officials. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

4. As an investigative or law enforcement officer, I spent five months at the FBI academy where I received specialized training in a variety of investigative and legal matters, including training in conducting narcotics investigations, and becoming familiar with the manner in which controlled substances are packaged, marketed, transported, and consumed.

5. On the job, I have participated in multiple separate investigations involving the importation and distribution of controlled substances. As part of these investigations, I have used various investigative techniques, including physical and stationary surveillance, informants and cooperating sources, pen register and trap and trace devices, telephone toll analysis, undercover operations, tracking warrants, search warrants, and electronic examinations of evidence. Through these investigations, my training, experience, and my conversations with other law enforcement investigators, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds related to the sales of narcotics. I also am familiar with the methods employed by narcotics organizations to thwart detection by law

enforcement, including but not limited to the use of cellular telephone technology, counter surveillance techniques, false or fictitious identities and addresses, and coded communications. Through the totality of my training and experience, I have familiarized myself with the jargon, mannerisms, and methods employed by importers and distributors of controlled substances.

6.    Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for individuals involved in the importation of federally controlled substances to work in concert with other individuals and to do so by utilizing cellular telephones and other portable communication devices to maintain communications with co-conspirators in order to further their illicit criminal activities. Drug traffickers often require the use of a telephone facility to negotiate times, places, schemes, and manners for importing federally controlled substances and for arranging the disposition of proceeds from the sales of controlled substances. The telephone enables such individuals to maintain contact with criminal associates and coordinate with them. As such, those devices can store information about key locations, including the location of stash houses and homes of associates. They also can store, among others, messages referring to the illicit arrangements and the payment of monies related to those arrangements, the names and contact information of associates, and photographs reflecting drug importation activity.

## JURISDICTION

7.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by Title 18, United States Code, Section 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

//

//

//

3

**PROBABLE CAUSE**

**A.    Background**

8.    On May 3, 2024, a grand jury returned an under-seal Indictment charging eleven counts of drug trafficking activity against Customs and Border Protection Officers (CBPOs) Diego BONILLO,[1] Jesse GARCIA, and a third individual who remains a fugitive. The charges include conspiracy to import controlled substances, in violation of Title 21, United States Code, Sections 952, 960, and 963; multiple counts of importation of controlled substances and aiding and abetting, in violation of Title 21, United States Code, Sections 952 and 960, and Title 18, United States Code, Section 2; *Pinkerton* liability; and criminal forfeiture. BONILLO was arrested on May 4, 2024.

9.    BONILLO's and GARCIA's arrests stemmed from a long-term investigation by FBI BCTF, with assistance from the Drug Enforcement Administration (DEA). The investigation found that BONILLO and GARCIA worked with a Mexico-based poly-drug Drug Trafficking Organization (DTO) to ensure that the DTO's drug-laden vehicles were admitted into the United States without inspection at the Otay Mesa, California and Tecate, California Ports of Entry (POEs), respectively.

10.    As CBPOs, BONILLO and GARCIA were randomly assigned to various locations throughout their respective POEs in one-hour assignments, which were posted daily. The randomness and limited duration of the assignments, as well as the timing of the

---

[1]    On May 4, 2024, an administrative subpoena was served on Verizon Corporation (Verizon) for subscriber information and telephone toll records for telephone number (619) 942-0940, *i.e.*, the telephone number associated with the **Target Account**, which was identified by BONILLO as belonging to him on CBPO records. Verizon records confirmed that BONILLO is the subscriber of the telephone number and has been since May 17, 2019. On June 22, 2024, investigators obtained records from Apple pursuant to a subpoena related to the same telephone number. The records revealed that the telephone number is associated with an Apple iCloud, *i.e.*, the **Target Account**. The records also reflected that the **Target Account** utilizes the following iCloud features: iCloud Backup (iOS Devices); Bookmarks; Calendars; iCloud Photos; Contacts; Find My Friends; iCloud Drive; Notes; and Sign-in with Apple. A preservation order was served upon Apple for the **Target Account**.

posting of the schedule, were efforts by CBP to reduce the potential for corruption. Nevertheless, the investigation reflected that BONILLO and GARCIA relayed their duty assignments to DTO members, including the times when they were assigned to the primary vehicle lanes and the specific lanes under their control, so that load vehicles could enter into the United States with their assistance free from inspection.

11.    To date, investigators have identified at least five drug seizures associated with BONILLO and GARCIA. One of the seizures is discussed below.

**B.    Nayeli Viridriana Servin Vega Smuggles Narcotics with the Assistance of the User of the Target Account**

12.    On February 6, 2024, at 12:54 p.m., Nayeli Viridriana Servin Vega entered the United States from Mexico at the Tecate POE in a Honda Odyssey bearing California license plates. Records from the POE reflect that GARCIA was assigned to work the primary vehicle lanes from 12:00 p.m. to 1:00 p.m. They also reflect that she was admitted by GARCIA despite there being an Automatic Referral for "High Risk Narcotics/Currency Smuggling" on the Odyssey. GARCIA subsequently told POE staff that he had received the alert late, which resulted in him admitting the Odyssey. However, an audit of GARCIA's computer revealed that the Automatic Referral was received approximately 55 seconds before he admitted the Odyssey.

13.    After Servin was admitted into the United States, undercover officers surveilled her from a few minutes after her admission until a traffic stop was conducted on her in Chula Vista, California. A K-9 alerted to the Odyssey, and a total of approximately 130 packages of methamphetamine, weighing approximately 58.87 kilograms, were found concealed inside a non-factory compartment located in the Odyssey's floorboard. The official DEA lab report is pending, although a presumptive test has reflected that one of the packages contained methamphetamine. Servin was arrested, and a telephone was seized.

14.    In addition to GARCIA, crossing records of Servin reflect that she coordinated her crossings in order to be admitted by BONILLO. For example, before

5

crossing through the Tecate POE, Servin crossed 32 times through the Otay Mesa POE vehicle lanes.[2] Five of those crossings were through BONILLO's lane, which reflects a coordinated effort. Indeed, 25 of the remaining 27 crossings were through lanes operated by *separate* CBPOs. Moreover, telephone evidence reflects that she was loaded and in contact with known co-conspirators on dates she crossed through BONILLO's lanes, and not at other times she crossed through the Otay Mesa POE. For example, on November 25, 2023, Servin entered the United States from Mexico at the Otay Mesa POE through a vehicle lane manned by BONILLO. Hours later, she took a picture of the Fusion Ultra Lounge located in Anaheim, California, where it appears she had been directed to deliver the drug load. On February 10, 2024, DEA investigators in Los Angeles executed a search warrant at the Fusion Ultra Lounge and seized approximately 225 pounds of methamphetamine, 1 kilogram of cocaine, and 10,000 fentanyl pills.

15.     Similarly, on December 14, 2023, after Servin entered the United States from Mexico at the Otay Mesa POE through BONILLO's lane, telephone evidence reflects that she had the following WhatsApp exchange with a co-conspirator:

Servin:                I'm about to get to San Clemente (audio message)

Servin:                I just passed secondary checkpoint

Co-Conspirator:   Were they there

Servin:                No, closed. Do you have an address yet?

16.     Investigators are aware that there is a checkpoint located near San Clemente, California. Investigators are further aware that the operational status of checkpoints is often of concern to drug traffickers because vehicles carrying drugs may be identified by law enforcement officers or K-9s working at the checkpoints. As such, investigators believe, based on training and experience, that Servin had imported federally controlled substances on this date. Further bolstering this belief is that, two minutes before Servin was admitted

---

[2]     TECs records are searchable via name. Investigators recently discovered a variation of Servin's name under which additional vehicle crossings through the Otay Mesa POE were uncovered.

by BONILLO on this date, BONILLO also admitted Gonzalez, who is discussed below, *and*, less than 20 minutes after Servin was admitted, BONILLO admitted Arquimides Jesus De Los Santos Rabiela[3] who, like Servin, was arrested on February 6, 2024, shortly after crossing through GARCIA's lane at the Tecate POE. His vehicle was found to contain approximately 32.35 kilograms of fentanyl, 37.1 kilograms of methamphetamine, and 54.6 kilograms of cocaine.

## C. Coordination by BONILLO with Luis Francisco Gonzalez-Montenegro and Others

17.    On February 15, 2024, a CBPO working pre-primary at the Otay Mesa POE inspected a Buick LaCrosse being driven by Luis Francisco Gonzalez-Montenegro. During the pre-primary inspection, the CBPO observed packages in one of the quarter panels and called-out over the radio "SDNET," which is an enforcement group that surreptitiously follows drug-laden vehicles from the POE in order to gain intelligence about other criminal associates and stash locations. The CBPO also notified the primary officer – BONILLO – and requested that the LaCrosse be sent to the secondary inspection area. Gonzalez was only one car away from BONILLO's booth at the time the discovery was made.[4] Notably, crossing records reflect that Gonzalez was admitted *four* other times by BONILLO at the Otay Mesa POE – a statistically improbable number of crossings unless coordinated.

18.    In secondary, a Z-Portal scan showed anomalies within the doors and rear quarter panels of the LaCrosse. A K-9 also alerted to the LaCrosse's trunk. Gonzalez and the LaCrosse were subsequently admitted into the United States, after placement of a GPS tracker, so that SDNET could follow it to its destination. Despite not being told that anything was amiss before he was released from the secondary inspection area, Gonzalez

---

[3]    Also, on the date of Rabiela's arrest, Gonzalez crossed immediately behind Rabiela through GARCIA's lane and then traveled in tandem with Rabiela until Rabiela was pulled over by San Diego Sheriff's Deputies. Investigators then observed Gonzalez circle the location of the traffic stop several times before leaving the area.

[4]    BONILLO has been charged by the grand jury on an aiding and abetting and/or *Pinkerton* theory with this importation.

engaged in highly surveillance-cautious maneuvers after leaving the POE, including driving aggressively and making sudden U-turns. Investigators are aware that such efforts are typically utilized by drug traffickers in an effort to ferret out whether they are being followed. Gonzalez eventually parked the LaCrosse in a public parking area and then fled out of the back of a store after convincing a store manager that he was in danger. The LaCrosse was left behind. Given Gonzalez's immediate suspicion after leaving the POE, investigators believe that BONILLO likely tipped-off the DTO that SDNET would be following Gonzalez. Indeed, actions by other members of the DTO confirm this belief. For example, as investigators watched, a different individual, later identified as Jamie Rose Perez, arrived after several hours to the LaCrosse. She then drove it to a few locations, including trying to stay the evening at a hotel, before parking the LaCrosse on the street overnight. She later returned the next day and drove it to a residence where it was taken into a garage.

19. A search warrant was then obtained for the residence. During execution, three males, later identified as Michael Morales, Cesar Meza, and Armando Gallo ran from the garage towards the rear of the residence and were apprehended at an outside patio. Inside the residence, Perez and another woman named Sheila Torres also were apprehended. Notably, Meza has three vehicle crossings through lanes manned by GARCIA, and one crossing through a lane manned by BONILLO. Similarly, crossing records reflect that Torres also crossed through BONILLO's lane approximately 18 minutes after Gonzalez entered in the LaCrosse.

20. A search of the LaCrosse resulted in the seizure of approximately 41 packages of fentanyl powder weighing approximately 43.42 kilograms; 3 packages of fentanyl pills, weighing approximately 2.18 kilograms; and 1 package of heroin, weighing approximately 1.01 kilograms. The packages were found concealed inside, among others, the vehicle's quarter panels, left door panels, and right passenger door panel. An additional 24 packages of fentanyl powder and 11 packages of fentanyl pills also were found in two duffle bags inside the residence.

21.     After her arrest, Torres was given the chance to make a call and told investigators that she wanted to call her cousin, who she identified as "Melissa." When the call was placed to the Mexican number of her supposed cousin, a male answered. Torres asked for Melissa, but the male seemed confused. This prompted Torres to exclaim, "Diego!" and state that she was in jail. The male then hung up. BONILLO's first name is "Diego," although investigators continue to investigate whether this was BONILLO.

**D.     Background Concerning Apple**

22.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

23.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web-browsers or mobile and desktop applications (apps). As described in further detail below, the services include email, instant messaging, and file storage:

a.     Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.     iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages (iMessages) containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

c.     iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations,

spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iCloud Backup allows users to create a backup of their device data.[5] iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d.    Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e.    Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

f.    Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System (GPS) networks, and Bluetooth, to determine a user's approximate location.

24.    App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

25.    Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as

---

[5]    As stated above, records provided by Apple reflect that the **Target Account** utilizes iCloud Backup.

Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

26. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone number(s). The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address (IP address) used to register and access the account, and other log files that reflect usage of the account.

27. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

28. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's

IP address and identifiers such as the Integrated Circuit Card ID number (ICCID), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address (MAC address), the unique device identifier (UDID), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

29.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service (SMS) and Multimedia Messaging Service (MMS) messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

//

//

## **ITEMS TO BE SEIZED**

30.     Investigators know that individuals working with criminal organizations often use multiple communication platforms in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Indeed, based on training and experience, investigators are aware that, in addition to telephone and text messaging services (*i.e.*, MMS and SMS), other communication platforms, like iMessage and WhatsApp, are also often used by drug traffickers to engage in their illegal activity. These communication services can be used to coordinate payments and meetings, conduct negotiations and other matters relating to the criminal scheme, and to send location data, photographs, audio files, and/or videos, concerning the criminal activity, all of which are available from iCloud as outlined above. Based on my training and experience, voicemails, audio files, photographs, videos, and documents also are often created and used in furtherance of criminal activity. Thus, stored communications and files connected to the **Target Account** may provide direct evidence of the offenses under investigation. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

31.     Account activity may also provide relevant insight into an account owner's state of mind as it relates to the offenses under investigation. For example, information in the account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications indicating a plan to commit a crime) or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement). Communications, notes, contacts, and other information that Apple can produce related to the **Target Account**, such as location data, also can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation, including addresses and/or vehicles used by the subjects of the investigation. And, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation, such as services used to communicate with co-conspirators.

Therefore, Apple's servers are likely to contain stored electronic communications and information constituting evidence of the crimes under investigation.

32.     Apple's servers also are likely to contain "user attribution" evidence. Such evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, device information, the data associated with the foregoing (such as geo-location, date, and time information), photographs, videos, and audio files may be evidence of who used or controlled the **Target Account** at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices – and thereby which user(s) – likely accessed the **Target Account**. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crimes under investigation.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

33.     Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Apple are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Apple for the relevant account and then to analyze the contents of that account on the premises of Apple. The impact on Apple's business would be severe.

34.     Therefore, I request authority to seize all content from the **Target Account**, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Apple, to protect the rights of the subject(s) of the investigation, and to effectively pursue this investigation, authority is sought to allow Apple to make a digital copy of the entire contents of the account subject to seizure, as described in Section II of Attachment B. The copy will be provided to me or to any authorized federal investigator. The copy will be forensically imaged, and the images will then be analyzed to identify communications and other data subject to seizure

pursuant to Section III of Attachment B. Relevant data will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

35.     Analyzing the data to be provided by Apple may require special technical skills, equipment, and software. It also can be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Certain file formats do not lend themselves to keyword searches. Keywords search text. Many common applications do not store data as searchable text. The data may be saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.

36.     Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to these warrants may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the examination will complete the analysis within **ninety (90) days** of receipt of the data from the service provider, absent further application to this Court.

37.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of the warrant. Investigators are aware from training and experience that planning and coordinating a drug-importation offense often takes weeks. Investigators also know that criminal associates are often unaware of an arrest and will continue to attempt to contact the arrestee after his/her arrest. As such, investigators seek all materials from Apple for the **Target Account** from September 22, 2023 (a month prior to Servin's first crossing in BONILLO's lane, which occurred on October 22, 2023), up to and including May 5, 2024 (the day after BONILLO's arrest).

//

//

## **PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

38.     There have been no prior attempts to obtain this evidence, except that on or about May 10, 2024, investigators obtained a search warrant for a telephone seized from BONILLO at the time of his arrest. Investigators may obtain some duplicate data from a search of that telephone to the extent it is associated with the **Target Account**.

## **CONCLUSION**

39.     Based on the forgoing, I request that the Court issue the proposed warrant.

_____

Special Agent Sarah Cordes
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 2nd day of July 2024.

_____

HONORABLE DAVID D. LESHNER
UNITED STATED MAGISTRATE JUDGE

## <u>ATTACHMENT A</u>
## PROPERTY TO BE SEARCHED

This warrant applies to information associated with (619) 942-0940, manefire@hotmail.com (the **Target Account**), an Apple Inc. (Apple) iCloud account that is stored at premises owned, maintained, controlled, and/or operated by Apple, an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way, Cupertino, California.

## **ATTACHMENT B**
## **ITEMS TO BE SEIZED**

### I.      Service of Warrant

The officer executing the warrant shall permit Apple Inc. (Apple), as custodian of the files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

### II.      Information to be Disclosed by Apple

To the extent that the information is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Apple, or has been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), Apple is required to disclose to the United States the following information for the account listed in Attachment A from September 22, 2023, up to and including May 5, 2024:

    A.    All subscriber and user information pertaining to the **Target Account**, in any form kept. Specifically:

        1.    All identity information, including full name(s), physical address(es), telephone number(s), email address(es) (including primary, alternate, rescue, and notification email address(es), and verification information for each email address),  the IP address(es) used to register the **Target Account**, methods of connecting, means and source of payment (including any credit or bank account numbers), and information related thereto, including the date(s) on which the **Target Account** were created and the length of service;

        2.    All device(s) associated with or used in connection with the **Target Account** and all device identifiers related thereto, including all current and past trusted or authorized iOS devices and computers, serial numbers, Unique Device Identifiers (UDID), Advertising Identifiers (IDFA), Global Unique Identifiers (GUID), Media Access Control (MAC) addresses, Integrated Circuit Card ID numbers (ICCID), Electronic Serial Numbers (ESN), Mobile Electronic Identity Numbers (MEIN),

Mobile Equipment Identifiers (MEID), Mobile Identification Numbers (MIN), Subscriber Identity Modules (SIM), Mobile Subscriber Integrated Services Digital Network Numbers (MSISDN), International Mobile Subscriber Identities (IMSI), and International Mobile Station Equipment Identities (IMEI);

3.   All records and information regarding locations where the **Target Account** or device(s) associated with the **Target Account** were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps; and,

4.   All records pertaining to communications between Apple and the user(s) of the **Target Account**, including contacts with support services and records of actions taken.

B.   All records pertaining to the types of service(s) used by the **Target Account**;

C.   All activity, connection, and transactional logs for the **Target Account** (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID logs, and sign-on logs for all Apple services;

D.   The contents of all instant messages associated with the **Target Account**, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the **Target Account** (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

E.   The contents of the **Target Account** stored on iCloud, limited to the following:

1. All voicemails and audio files;

2. All images and videos, including those available on iCloud Photo Sharing, My Photo Stream, and iCloud Photo Library;

3. The content of all applications, including those in iCloud Backup and/or iCloud Drive, capable of being used to communicate with others, including but not limited to Instagram, Facebook, and WhatsApp;

4. All address books, contact, and buddy lists; and,

5. All notes.

F. All files, keys, or other information necessary to decrypt any data produced in an encrypted form pertaining to the **Target Account**, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

## III.   Information to be Seized by the United States

All information described above in Section II that constitutes evidence, fruits, and instrumentalities of violations of federal criminal law, namely, importation of controlled substances and conspiracy to do the same, in violation of Title 21, United States Code, Sections 952, 960, and 963, those violations involving the user(s) of the **Target Account**. Specifically:

A. Electronic records, such as communications, photographs, audio files, videos, and location data, tending to indicate efforts to import federally controlled substances, which may include evidence of unexplained wealth;

B. Evidence indicating how and when the **Target Account** was accessed or used to determine the user(s)' travel to or presence at locations involved in efforts to import federally controlled substances, such as Ports of Entry, stash houses, load locations, or other meet/delivery points;

C. Evidence indicating the motive, intent, or consciousness of guilt of the user(s) of the **Target Account** as it relates to the crimes under

investigation, *i.e.*, the importation of federally controlled substances;

D.    Evidence indicating the identity of the person(s) who created or used the **Target Account**; and,

E.    Evidence indicating the identity of the person(s) who communicated with the **Target Account** about the importation of federally controlled substances, including records that help reveal those person(s)' whereabouts.